**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION**

| | | |
|---|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | Civil Action No. 1:19-cv-08454 |
| | : | |
| BLUPRINT LLC, | : | |
| | : | |
| Defendant. | : | |
| | : | |

| | |
|---|---|
| MELANIE E. DAMIAN, AS RECEIVER OF RAJIV PATEL, a/k/a RAVI PATEL, a/k/a RAJ PATEL, MELANIE E. DAMIAN, AS RECIEVER OF BLUPRINT, LLC, and MELANIE E. DAMIAN, RECEIVER, as Assignee of Claims of KALPANA PATEL, | ANCILLARY CASE NO. |
| | |
| Plaintiff, | |
| v. | |
| | |
| TD AMERITRADE, INC. and CHARLES SCHWAB FUTURES AND FOREX LLC f/k/a TD AMERITRADE FUTURES & FOREX, LLC, | |
| | |
| Defendants. | |

/

## **COMPLAINT**

Melanie E. Damian, the court-appointed receiver ("Plaintiff" or the "Receiver") over the assets of Rajiv a/k/a Ravi Patel ("Patel") and over the receivership entity Bluprint LLC ("Bluprint") in the above-captioned enforcement action and as assignee of the claims of Kalpana Patel, files this Complaint stating claims against Defendant TD Ameritrade, Inc. and Charles Schwab Futures and Forex LLC f/k/a TD Ameritrade Futures & Forex LLC (collectively, "TDA" or "Defendant"). Plaintiff asserts claims for breach of fiduciary duty, aiding and abetting breach

of fiduciary duty, negligence (in the alternative), fraudulent transfer, unjust enrichment, and aiding and abetting violations, and violations of the Commodity Exchange Act, and alleges as follows:

## PROCEDURAL HISTORY

1.      On January 18, 2022, the Commodity Futures Trading Commission (the "CFTC") filed a Complaint for Injunctive Relief and Penalties Under the Commodity Exchange Act and Demand for Jury Trial [CFTC Action, ECF No. 1] against Patel and Bluprint (collectively, the "Receivership Defendants"), commencing the above-captioned enforcement action (the "CFTC Action").

2.      On January 18, 2022, the CFTC filed an Expedited Motion for an Ex Parte Statutory Restraining Order and Order to Show Cause [CFTC Action, ECF No. 4] and a Motion for Preliminary Injunction [*id.* at ECF No. 6].  On January 21, 2022, the Court entered a Corrected Order Granting Expedited Ex Parte Motion for Ex Parte Statutory Restraining Order and Granting Motion for Expedited Discovery (the "Statutory Restraining Order" or "SRO") [*id*. at ECF No. 14].

3.      On February 16, 2022, the CFTC filed a Renewed, Modified, and Unopposed Motion for Preliminary Injunction [*id.* at ECF No. 41] (together with the Motion for Preliminary Injunction, the "Motions for Preliminary Injunction").

4.      On February 17, 2022, the Court entered an Order Granting the Motions for Preliminary Injunction [*id.* at ECF No. 41] (the "Preliminary Injunction").  Pursuant to the Preliminary Injunction, the assets of the Receivership Defendants were frozen and all records of the Receivership Defendants' activities were ordered to be preserved.  *See id*.

5.      On March 10, 2022, the CFTC filed a Motion for Appointment of a Receiver.  *Id.* at ECF No. 44.

6.      On March 30, 2022, the Court entered an Order Appointing Receiver (the "Order Appointing Receiver") [*id.* at ECF No. 50].

7.      The Receiver's mandate was to, *inter alia*, take exclusive custody, control, and possession of the Receivership Estate, assume full control of the Receivership Defendants, prevent the withdrawal or misapplication of funds entrusted to the Receivership Defendants, collect all money owed to the Receivership Defendants, perform all acts necessary to conserve, hold, manage, and preserve the value of the Receivership Estate. *See* Order Appointing Receiver [*id.* at ECF No. 50] at pp. 4-7.

8.      The Order Appointing Receiver appointed the Plaintiff as Receiver over the assets of Patel and Bluprint, and any affiliates or subsidiaries owned or controlled by them.

9.      The CFTC amended its Complaint to add Patel's widow, Kalpana Patel ("Ms. Patel"), as a Relief Defendant to allow the Receiver to take over Ms. Patel's interest in any assets purchased using investor funds, among other relief.

10.      The Receiver and Ms. Patel settled the Receiver's potential claims against Ms. Patel and members of the Patel family and in exchange Ms. Patel assigned her claims against Defendant to the Receiver.

11.      The Order Appointing Receiver authorizes and directs the Receiver to initiate, defend, compromise, adjust, intervene in, dispose of, or become a party to any actions or proceedings the Receiver deems necessary and advisable to preserve or increase the value of the Receivership Estate. *See id.* at ¶ H.

## THE PARTIES

### The Receiver

12.     Plaintiff, Melanie E. Damian, was appointed by this Court as Receiver of the assets of the Receivership Defendants.  Plaintiff brings this action in her capacity as Receiver of Bluprint, pursuant to the authority granted by this Court in the CFTC Action.

13.     The Receiver also received an assignment of any claims and rights of action that Kalpana Patel may have, as the widow of Patel and as an account holder at TDA, against Defendant.  Thus, Plaintiff also brings this action on behalf of Kalpana Patel.

### The Defendant

14.     TDA, at all material times was a Delaware limited liability company with its principal place of business in Omaha, Nebraska, but it conducts business and has customers all over the world including in the Southern District of Florida.

15.     TDA operates as a brokerage and trading institution which allows retail customers like Rajiv and Kalpana Patel (the "Patels") to trade using TDA's online trading platform.  TDA's platform brings execution and clearing services and allows for the online trade of assets such as futures and stocks for retail customers such as the Patels.  It is regulated under the Commodity Exchange Act, among other federal and state securities and commodities laws.

16.     Defendant Charles Schwab Futures and Forex LLC ("Schwab") at all material times was a Delaware limited liability company with its principal place of business in Chicago, Illinois, but it conducts business and has customers all over the world including in the Southern District of Florida.

17.      Prior to a name change in September 2021, as part of a buy-out, Charles Schwab Futures and Forex LLC was known as TD Ameritrade Futures & Forex LLC.  Schwab and TDA

are affiliated corporations pursuant to Schwab's purchase of TDA and TDA is under the umbrella of The Charles Schwab Corporation.

18.    Schwab operates as a futures commission merchant that solicits and accepts orders to buy or sell futures contracts for consumers such as the Patels.  It is regulated under the Commodity Exchange Act, among other federal and state securities and commodities laws.

19.    Receivership Defendant Patel and Ms. Patel had a TDA account ending in 4195 (the "Brokerage Account").  The Patels also had a TDA futures trading account held with TD Ameritrade Futures & Forex LLC, transferred under the umbrella of Schwab, ending in #F880 (the "Futures Account").  Patel and his son also had a joint brokerage account and a futures account at TDA through which some commingled investor funds were also traded.  The Patels' children also had minor custodial accounts at TDA.

20.    From January 2019 through February 2021, Bluprint investor deposits were wired into the TDA Brokerage Account and then immediately swept into brokerage and futures trading at TDA or transferred to the Patels' accounts at other banks for personal use.

## JURISDICTION AND VENUE

21.    This action is brought to accomplish the ends sought and directed by the District Court in the CFTC Action, which, among other things, appointed Plaintiff as the Receiver and authorized her to commence actions to recover assets of and for the benefit of the Receivership Estate.  This action is related to the claims in the CFTC Action, over which this Court has original jurisdiction pursuant to Title 28, United States Code, Section 1331, in that this action forms "part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).   Pursuant to the principles of ancillary jurisdiction or supplemental jurisdiction, this

Court has supplemental jurisdiction over the claims set forth herein pursuant to Title 28, United States Code, Section 1367(a). As such, this Court has subject matter jurisdiction over this action.

22.     Plaintiff was appointed as Receiver in this District, the instant Complaint is brought to accomplish the objectives of the Preliminary Injunction and Order Appointing Receiver, and the property sought by Plaintiff is located in multiple districts.

23.     This Court has personal jurisdiction over Defendant because Defendant received funds from Patel, who was operating, conducting, engaging in, and carrying on a fraudulent business or business venture in, among other locations, the Southern District of Florida. The transfers comprised of commissions and fees that Defendant received from trading in the Patels' TDA accounts were investor deposits and proceeds from Bluprint's fraudulent scheme conducted in the Southern District of Florida. Defendant also directly received investor deposits from investors located in this District and those deposits were intended for trading in the Bluprint investment scheme carried out in this District.

24.     The Court also has jurisdiction over Defendant because it regularly conducts business and recruits and serves customers in the State of Florida, including in this District.

25.     Further, the Court has jurisdiction over the Defendant because it solicited funds from the Patels in the State of Florida, transacted business with the Patels in this District, and received funds from them originating in this District. In doing so, Defendant purposefully directed its activities to this state and District and availed itself of the privileges of conducting activities in this state and District. And, Patel paid Defendant significant sums in commissions and fees to perpetuate the misappropriation of funds derived from investors in the Bluprint scheme.

26.     Further, at all times material hereto, upon information and belief, Defendant aided and abetted Patel and Bluprint in the conduct subject of the CFTC Enforcement Action in this

District, specifically, allowing the illegal pooling of funds affecting investors located in this District and causing harm to such investors. Moreover, Defendant allowed the Patels to open and personally trade misappropriated money under Kalpana Patel's name, who did not authorize the opening of a futures trading account at TDA.

27.     Patel and Bluprint, using the Patels' TDA accounts, engaged in a scheme to solicit and misappropriate funds to potential customers located in the District and causing harm to such customers.

28.     The Court also has personal jurisdiction over Defendant because it received funds from the Patels and from Bluprint's investors, while Receivership Defendants were operating, conducting, engaging in, and carrying on a fraudulent business or business venture in, among other locations, this District. The transfers that Defendant received from the Patels were proceeds from Bluprint's investors collected as a result of Bluprint's fraudulent scheme conducted, in part, in this District.

29.     Venue is proper in the Southern District of Florida pursuant to Title 28, United States Code, Sections 754 and 1692, because this action is brought to accomplish the objectives of the Preliminary Injunction and the Order Appointing Receiver and is thus ancillary to the Court's exclusive jurisdiction over the Receivership Estate. Further, the transfers described in this Complaint were made from the Patels TDA accounts using funds collected from Bluprint's investors located in the Southern District of Florida.

## THE RECEIVER'S STANDING
## TO BRING THE CLAIMS ASSERTED HEREIN

30.     The Receiver has standing to bring the claims asserted in this Complaint pursuant to the Court's Order Appointing Receiver. *See* CFTC Action, ECF No. 50 at ¶ H. The Order Appointing Receiver authorizes and empowers the Receiver to:

> Initiate … or become a party to any actions or proceedings…that the Temporary Receiver deems necessary to preserve or increase the value of the Receivership Estate or that the Receiver deems necessary and advisable to carry out to Receiver's mandate under this Order.

*Id*.  Included among such actions are fraudulent transfer actions to recover for the benefit of the Receivership Estate amounts that Patel and/or Bluprint fraudulently transferred to third parties.

31.     The Receiver, on behalf of Receivership entity Bluprint, is a "creditor" of pre-Receivership Bluprint as defined in section 726.102, Florida Statutes.  As such, the Receiver has standing to bring the claims asserted in this Complaint under the Florida Uniform Fraudulent Transfer Act, section 726.101, Florida Statutes, *et seq*. and common law unjust enrichment (pled in the alternative to the fraudulent transfer claims).

32.     Moreover, the Receiver was assigned the rights of Kalpana Patel to pursue her claims against TDA and, as such, has standing to bring this action on behalf of Kalpana Patel, as a former accountholder of TDA.

## **FACTUAL ALLEGATIONS**

33.     Defendant knowingly and substantially assisted, aided and abetted, enabled, and facilitated Patel and Bluprint's fraudulent commodity pooling and Ponzi scheme that misused and misappropriated millions of dollars from sixteen Bluprint investors, leaving Patel and Bluprint subject to the CFTC Action and potentially liable to those investors, all through accounts held with Defendant and with its knowing and/or willful gross negligent assistance.

34.     Bluprint's Ponzi scheme was organized and perpetrated by Patel, its control person, as a result of his fraudulent domination, adverse interest in, and control of Bluprint and as part of his continued breaches of fiduciary duties to Bluprint.

**Patel and Bluprint's Pooling Scheme**

35.     From at least June 2019 through and continuing through January 2022 (the "Relevant Period"), Patel, through Bluprint, was involved in orchestrating a fraudulent scheme to solicit and misappropriate investor funds for the purported purpose of trading commodity futures and securities in a commodity pool.  Bluprint solicited at least $11.3 million from at least sixteen investors and misappropriated the funds by depositing monies into trading accounts, such as the Patels' Brokerage and Futures Accounts at TDA.

36.     Bluprint is a Florida limited liability company formed in June 2018 that operated from Patel's residence in Wellington, Florida.  Patel was the managing director and Chief Executive Officer of Bluprint.

37.     Patel advertised Bluprint as a company providing expertise in commodity futures trading and touted his extensive expertise and skill in identifying profitable trades on behalf of himself and Bluprint's investors, with guaranteed returns for investors.  Patel held discretionary authority on how to invest Bluprint's investors' money.  Investors were not involved in or informed of the daily trading activity, profits or losses, or otherwise.

38.     Patel always represented himself as extremely wealthy and successful and advised Bluprint's investors that he was essentially doing them a favor in allowing them to pool their funds in the Patels' TDA Brokerage Account so that he could manage their funds as he did his personal funds and create similar wealth for Bluprint's investors.

39.     The TDA Brokerage Account used by Patel for the Bluprint investment scheme was opened by the Patels nearly 20 years ago for personal investing.  Thus, both Rajiv and Kalpana Patel were account holders named on the Brokerage Account.  Accordingly, TDA owed a fiduciary duty to Ms. Patel.

40.     Prior to the creation of the Bluprint investment scheme, the TDA Brokerage Account had not been used to collect large deposits from third parties or to carry out high volume or margin trading at the high levels of risk implemented during the Bluprint investment scheme.

41.     During the Relevant Period, Receivership Defendants solicited investors for the purpose of offering trading services.  Receivership Defendants acted as a commodity pool operator ("CPO") by soliciting and receiving the funds from investors, which were, in large part, deposited in the Patels' TDA Brokerage Account.

42.     Almost immediately upon receipt, Bluprint misappropriated investors' deposits by spending the funds on personal expenses, making payments to other investors (akin to a Ponzi scheme), and using the funds for personal and/or high-risk trading using TDA's brokerage and futures trading platforms.

43.     As a result of this fraudulent behavior, the CFTC commenced the CFTC Action against the Receivership Defendants that resulted in entry of the Preliminary Injunction finding that Bluprint engaged in fraud in connection with commodity futures and options transactions by making misrepresentations of material fact to pool participants.  By the time the fraud was uncovered, the funds were largely or completely depleted.

44.     Indeed, the Bluprint fraud was perpetrated through and facilitated by the accounts held at TDA.  Specifically, Receivership Defendants directly and indirectly received and pooled investor deposits in the TDA Brokerage Account.  *See* CFTC Action, ECF No. 41, at p. 11.  Then, they used the TDA Brokerage Account to trade those pooled funds.  And, during the Relevant Period, Patel opened the Futures Account at TDA to carry out high-risk, margin trades of pooled investor funds.

45.     When certain investors demanded a return of their investments, Bluprint was able to cover those payments by using funds it received from new or repeat investors who continued to invest with Bluprint, making the business a classic Ponzi scheme.

46.     According to Patel and Bluprint's banking and trading account statements, Patel's trading activity carried out through Defendant's trading platforms was never profitable and indeed only incurred significant losses.  And, Patel and Bluprint only generated "revenue" in the form of investments from investors totalling approximately $11.8 million, all of which was lost in trading.

47.     Patel's bank records show that Patel also obtained loans and deposited the loan proceeds into the same TDA Brokerage account into which he deposited the investor funds, such that they were commingled with the funds from investors and short-term trading profits in the TDA Brokerage Account.

48.     Because Patel's trading activity was not generating sufficient revenues for Bluprint to pay the amounts he had guaranteed to the investors, Bluprint covered the significant shortfall primarily by using funds it obtained from new and repeat investors, and also by using the commingled proceeds of a significant loan it received from a lender, to return funds to earlier investors to perpetuate and conceal the scheme, to continue high risk trading, and to make payments towards the loan.

49.     A substantial portion of the financial misconduct was perpetrated through and facilitated by accounts held with Defendant, which were used to further the Receivership Defendants' commodity pooling and Ponzi scheme.  The Ponzi scheme started no later than June 2019, when the revenues or returns from Patel's trading activity at TDA was considerably lower than, and insufficient to pay, the amounts that Patel had promised the investors would make on

their investments.  And, the balances in the TDA accounts were significantly less than the total amount the investors had invested with the Receivership Defendants.

50.     One investor received the return of its full investment plus additional amounts, and other investors received partial returns of their investments because they were early investors who demanded repayment well before the commencement of the CFTC action or because Patel chose to pay them to prevent them from speaking poorly of the Bluprint investment scheme to potential investors.

51.     But the majority of investors received back significantly less than the amounts they had invested or nothing at all because they invested closer in time to the commencement of the CFTC Action.

**Preliminary Findings of Fraud Against Receivership Defendants**

52.     As a result of this fraudulent behavior, the CFTC commenced the CFTC Action against Patel and Bluprint that resulted in entry of the Preliminary Injunction containing preliminary findings that Receivership Defendants likely participated in a fraudulent commodity trading scheme.

53.     At all times material hereto, Patel controlled and operated Bluprint as a means to carry out the fraudulent scheme, thereby causing Bluprint to commit violations of commodity futures trading laws and rules, common law fraud, and breaching his fiduciary duties to Bluprint and its investors.  Bluprint was under the control of Patel until the appointment of the Receiver and thus unable to cease the fraudulent activity and/or seek recovery of the misappropriated funds or fraudulent transfers prior to that point.

54.     In the Preliminary Injunction, the Court determined that the record supported a finding that between at least "June 2019 and continuing through the date of service of the Statutory

Restraining Order, January 21, 2022 ("the Relevant Period"), at least sixteen third-party individuals and entities provided Patel and Bluprint a total of at least $11,830,000 for the purpose of investing in Bluprint and sharing in profits earned from Bluprint's investment ventures, which purportedly included trading commodity futures, among other things." *Id.* at p. 5.

55.    With respect to those third-party funds, the Court held that the record supported the CFTC's prima facie showing that during the Relevant Period,

> Patel and Bluprint engaged in fraud in connection with commodity futures and options transactions by making misrepresentations of material fact to pool participants, misappropriating pool participant funds, and issuing false account statements; engaged in fraud and deceit as a commodity pool operator (CPO) and associated person (AP) of a CPO; failed to register Bluprint as a CPO and filed to register as an AP of a CPO; commingled commodity pool funds; failed to operate a commodity pool as a separate entity; received pool participants' funds in a name other than that of the commodity pool; and failed to provide certain pool disclosure documents and other documents required to be provided to pool participants under Commission Regulations. Therefore, there is good cause to believe that Defendants, by and through their agents, principals, and control persons, have engaged in, are engaging in, or are about to engage in violations of Sections 4b(a)(1)(A)-(C),  4c(b),  4k(2),  4m(1),  and  4o(1)(A)-(B)  of  the [Commodity Exchange] Act [(the "Act")], 7 U.S.C. §§ 6b(a)(1)(A)-(C), 6c(b), 6k(2), 6m(1), 6o(1)(A)-(B), and Regulations 4.20(a)(1), (b), and (c), 4.21, 4.22, and 32.4, 17 C.F.R. §§ 4.20(a)(1), (b), and (c), 4.21, 4.22, 32.4 (2021).

Preliminary Injunction [CFTC Action, ECF No. 41, at pp. 14-15; *see also* Order Granting Expedited Ex Parte Motion for Ex Parte Statutory Restraining Order and Granting Motion for Expedited Discovery [ECF No. 11 at p. 3]; Corrected Order Granting Expedited Ex Parte Motion for Ex Parte Statutory Restraining Order and Granting Motion for Expedited Discovery [ECF No. 14 at p. 3].

Further, the Court ordered a continued freeze of Receivership Defendants' liquid and illiquid assets, including funds held in bank and trading accounts in Defendants' names. *See* Preliminary Injunction at p. 15. Finally, the Court held that the CFTC's requested relief of disgorgement and restitution for pool participants was appropriate in this case. *See id.*

13

**The Insolvency of Bluprint**

56.    As a result of operating a commodity pooling and Ponzi scheme, Bluprint was insolvent, undercapitalized, and operating at a loss.  During all relevant times, Bluprint did not have sufficient assets to pay its debts to investors and/or creditors as those debts became due.

57.    Patel and Bluprint's trading activity resulted in significant overall trading losses of the investors' funds totaling at least $5,117,353.75.  Receivership Defendants distributed $2,964,841.23 to investors (in Ponzi scheme fashion).  And Patel used the remainder of the funds totaling at least $2,865,631.71 to pay for his personal living expenses and luxury items and experiences.  Consequently, by November 21, 2021, Patel had depleted nearly all of the investors' funds.

58.    Because most investors have not received the return of their investment or all of the amounts due to them, these investors have significant claims against the Receivership Estate to recover their investments.

**TDA's Involvement in Patel and Bluprint's Scheme**

**Receivership Defendants Carry Out Pooling and Ponzi Scheme Transfers**

59.    Patel breached his fiduciary duties to Bluprint by: (1) knowingly and intentionally operating Bluprint as a commodity pooling scheme and as a Ponzi scheme; and (2) diverting Bluprint's funds for his personal benefit, in breach of his fiduciary duty to Bluprint.  TDA facilitated both aspects of Patel's ongoing fraudulent scheme and breaches of fiduciary duties thereby aiding and abetting Patel's breaches and breaching their own fiduciary duties and duty of care to co-accountholder, Ms. Patel.

60.    TDA had knowledge of Patel's scheme derived from: (i) processing and accepting the third-party deposits of funds into the Patels' Brokerage Account maintained at Defendant via

14

wire transfer; (ii) processing and accepting Patel's immediate transfer of those third-party funds to Defendant's trading platforms and misuse of those funds in the high-risk Futures Account and on TDA's margin trading platforms; (iii) witnessing how Patel's account management and investing style, commencing in June 2019, greatly differed from the Patels' investment style for the previous 17 years; (iv) witnessing that Patel's account management and investment style commencing in June 2019 was not sustainable; (v) processing and transferring at Patel's direction funds to third parties using new third-party deposits and commingling third-party deposits with the Patels' personal funds and loan proceeds; (vi) preparation of account statements and demands for payment of margin debt evidencing that Patel's high risk trading generated little or no revenue; (vii) discharging of anti-money-laundering (AML)-related duties pertaining to "know your customer" and customer due diligence, both at onboarding and throughout the brokerage relationship with the Patels; and (viii) access to personal and financial information for the Patels which would have revealed that Patel was misusing the Patels' TDA Accounts, without Ms. Patel's knowledge, consent, or participation.

61.    With TDA's assistance, Patel was able to pool investor funds and to use new investor funds to carry out high-risk trading and to pay amounts owed to Bluprint's earlier investors.

62.    Generally, Defendant facilitated the operation of a commodity pooling scheme and of a Ponzi scheme pursuant to Patel's instructions and transfer orders, which were carried out seemingly without question.  Specifically, (i) Defendant reviewed and processed high-dollar amount, electronic transfers from third parties coming into Patel's Brokerage Account earmarked as new investor funds; (ii) Defendant, on Patel's instructions, swept those investor funds from the Brokerage Account to the Futures Account for high-risk, margin trading; (iii) Defendant swept

those funds out of the Brokerage Account for payment of margin debts; (iv) Defendant transferred those funds out of the Brokerage Account as payments to earlier investors; (v) Defendant transferred those funds out of the Brokerage Account to various other futures trading merchants; (vi) Defendant transferred those funds out of the Brokerage Account to Patel for personal expenses; (vii) Defendant sat by as the Patels' account was rapidly depleted of over $6 million in investor funds; and (viii) despite the significant losses in the Patels' Accounts, Defendant collected over $414,086.96 in commissions and fees.

63.     TDA allowed Patel to pool third party funds in the Brokerage Account and then to trade them improperly in a commodity trading pool and to transfer away those funds for improper purposes in breach of applicable commodity futures trading laws and in breach of Patel and Bluprint's fiduciary duties to investors and in breach of TDA's fiduciary duties and duty of care to Ms. Patel as an innocent, unknowing co-account holder.

64.     Patel carried out this obvious pooling and Ponzi scheme for more than two years, until March 2021, when TDA closed all of the Patel family's accounts because they could no longer ignore the pooling of third-party funds and high-risk trading scheme.

65.     As a result, in March 2021, Patel moved the remaining investor deposits out of the TDA Brokerage Account to various other trading institutions where he continued to operate Bluprint as a Ponzi scheme.

66.     Patel continued operating his investment scheme without pause for 10 more months.

**Overview of Banking Regulations Applicable to Defendant**

67.     TDA is subject to a myriad of banking regulations designed to prevent it from disregarding or assisting in fraudulent and illegal behavior by its customers.   While those

regulations do not give rise to a private cause of action by victimized investors, they are useful to understand the framework and circumstances pursuant to which Defendant was required to learn about Patel's business and background and the types of details that TDA had to learn about Patel's account-related activities.

68.     Fraudulent activities, such as Ponzi schemes and money laundering, typically involve processing transactions through financial institutions.  As a result, federal law mandates that banks must have knowledge of their customers and their banking behavior.  Regulations require that banks implement procedures that enable them to accurately identify their customers and collect relevant information to "form a reasonable belief that it knows the true identity of each customer".  31 C.F.R. §§ 1020.220(a)(1), (2).  Accordingly, banks are required to obtain information about the account holder for every account at the onboarding stage and throughout the banking relationship.

69.     TDA is bound by the Bank Secrecy Act (BSA), which mandates that the bank must create, manage, and uphold a program to ensure adherence to additional anti-money laundering measures.  *See* 12 C.F.R. § 21.21.  The BSA also applies to TDA as a futures commission merchant.  It requires financial institutions to implement various measures to prevent money laundering, terrorist financing, and other illegal financial activities.  Specifically, TDA must: (1) institute a system of internal controls to guarantee ongoing BSA compliance; (2) undertake independent testing of the bank's compliance; (3) appoint an individual to oversee and monitor compliance; and (4) provide relevant personnel with appropriate training.  Financial institutions must also file reports with the Financial Crimes Enforcement Network (FinCEN) for certain types of transactions, such as large deposits and suspicious activity.

70.     TDA also must develop a customer due diligence program to assist in predicting

the types of transactions, dollar volume, and transaction volume each customer is likely to conduct. This enables the bank to identify unusual or suspicious transactions for each customer. The customer due diligence program provides the bank with the ability to monitor the financial activity of its customers and predict the type and frequency of transactions in which they are likely to engage.

71.     Customer due diligence ("CDD") programs should be tailored to the risk presented by individual customers, such that the higher the risk presented, the more attention is paid. Where a customer is determined to be high risk (such as the Patels based on the high-volume trading), banks should gather additional information about the customer and accounts, including determining: (1) purpose of the account; (2) source of funds; (3) proximity of customer's residence to the bank; and (4) explanations for changes in account activity.

72.     The customer due diligence is required at the onboarding stage and continuously throughout the banking relationship.

73.     The Code of Federal Regulations outlines additional responsibilities of futures commission merchants to know your customer and prevent possible money schemes. *See* 31 CFR §§1026.210, 1026.220. It outlines that TDA should: (1) conduct ongoing monitoring to identify and report suspicious activity; (2) implement a Customer Identification Program ("CIP") to enable TDA to know the true identity of the customer; and (3) understand the nature and purpose of the customer relationship for the purpose of developing a customer risk profile. *Id.*

74.     Defendant and its personnel must be able to identify and take appropriate action once put on notice of any of a series of suspicious or improper behaviors set forth in the Federal Financial Institutions Examination Council's ("FFIEC") Bank Secrecy Anti-Money Laundering Manual ("FFIEC Manual"), including: (1) repetitive or unusual fund transfer activity; (2) fund

transfers sent or received from the same person to or from different accounts; (3) transactions inconsistent with the account holder's business; (4) transfers of funds among related accounts; (5) depositing of funds into several accounts that are later consolidated into a single master account; (6) large fund transfers sent in round dollar amounts; (7) multiple accounts established in various corporate names that lack sufficient business purpose to justify the account complexities; (8) multiple high-value payments or transfers between shell companies without a legitimate business purpose; (9) payments unconnected to legitimate contracts or revenue sources; (10) fund transfers containing limited content or related party information; (11) transacting businesses sharing the same address; and (12) an unusually large number of persons or entities receiving fund transfers from one company. *See* FFIEC BSA/AML Examination Manual, https://bsaaml.ffiec.gov/manual.

75.     Having in its possession the financial information about Patel and all his banking transactions, acquired in part through its discharge of its BSA/AML-related duties, Defendant had actual knowledge of Bluprint's Ponzi scheme.  Defendant facilitated and substantially assisted the scheme in violation of its obligations under federal laws and regulations.  Indeed, after having full knowledge of the change of the account to high-volume risk trading through third-party deposits TDA continued to do business with Patel allowing Patel to accept new investments from new unsuspecting victims.

76.     Pursuant to the banking regulations and requirements, Defendant had sufficient evidence and other indicia of wrongdoing to know about Patel's scheme yet looked the other way from the fraud being perpetuated in plain sight within and through its accounts.

**Use of the TDA Brokerage Account to Receive Investor Deposits**

77.     On February 11, 2019, the Patels' TDA Brokerage Account received a wire for $750,000[1] from Bluprint investor A.[2]

78.     On June 5, 2019, the Patels' TDA Brokerage Account received a wire for $300,000 from Bluprint investors B and C.

79.     On July 3, 2019, the Patels' TDA Brokerage Account received a wire for $298,000 from TEM, LLC.  These funds represented loan proceeds used to fund the Bluprint trading scheme.

80.     On August 12, 2019, the Patels' TDA Brokerage Account received a wire for $100,000 from Bluprint investor A and a wire for $100,000 from Bluprint investors B and C.

81.     On October 8, 2019, the Patels' TDA Brokerage Account received a wire for $100,000 from Bluprint investor D.

82.     On November 29, 2019, the Patels' TDA Brokerage Account received a wire for $100,000 from Bluprint investor E.

83.     On January 16, 2020, the Patels' TDA Brokerage Account received a wire for $1 million from Bluprint investor F.

84.     On January 21, 2020, the Patels' TDA Brokerage Account received a wire for $500,000 from Bluprint investor G.

85.     On February 26, 2020, the Patels' TDA Brokerage Account received a wire for $75,000 from Bluprint investor H.

---

[1] Upon information and belief, to be confirmed during the discovery process, many of the listed incoming wire transactions indicated on their face that the money was being deposited in the Patels' accounts were from investors and earmarked for a specific purpose.

[2] The names of the investors will be represented by letters to protect their identities and prevent their further victimization.

86.     On March 20, 2020, the Patels' TDA Brokerage Account received a wire for $500,000 from Bluprint investors B and C.

87.     On April 21, 2020, the Patels' TDA Brokerage Account received a wire for $75,000 from Bluprint investor H and a wire for $75,000 from Bluprint investor E.

88.     On April 30, 2020, the Patels' TDA Brokerage Account received a wire for $75,000 from Bluprint investor E.

89.     On May 22, 2020, the Patels' TDA Brokerage Account received a wire for $1,500,000 from Bluprint investors B and C.

90.     On June 17, 2020, the Patels' TDA Brokerage Account received a wire for $50,000 from Bluprint investor E.

91.     On August 28, 2020, the Patels' TDA Brokerage Account received a wire for $25,000 from Bluprint investor E.

92.     On September 9, 2020, the Patels' TDA Brokerage Account received a wire for $500,000 from Bluprint investor I.

93.     On September 25, 2020, the Patels' TDA Brokerage Account received a wire for $70,000 from Bluprint investor E.

94.     On October 20, 2020, the Patels' TDA Brokerage Account received a wire for $100,000 from Bluprint investor E.

95.     On October 21, 2020, the Patels' TDA Brokerage Account received a wire for $300,000 from Bluprint investor J.

96.     On January 27, 2021, the Patels' TDA Brokerage Account received a wire for $15,000 from Bluprint investor H and a wire for $25,000 from Bluprint investor E.

97.     On February 2, 2021, the Patels' TDA Brokerage Account received a wire for $75,000 from Bluprint investors K and L.

98.     Patel then swept Bluprint's investor deposits from the TDA Account into the Brokerage and Futures Accounts.

99.     Rather than stop Patel or decline to help him misuse investor money, TDA executed his instructions to misappropriate investor money.

**Use of the Brokerage and Futures Account to Trade Investor Funds**

100.    Throughout the Relevant Period, without Ms. Patel's knowledge, Patel used the TDA Brokerage Account to sweep Bluprint investor deposits into brokerage and futures trading platforms.  Those platforms allowed for trading on margin thereby allowing for significant losses which Patel then covered with new investor deposits.

101.    TDA not only failed to do anything to stop Patel from using his accounts, which TDA knew held third-party funds, not Patel's personal money; it also actively and knowingly assisted him, in a substantial departure from typical banking practices, by allowing him to open a futures account without any due diligence.

102.    In addition to the brokerage and futures trading occurring through the Brokerage Account, on August 16, 2019, Patel opened the Futures Account with TD Ameritrade Futures and Forex, LLC (which was later transferred to Schwab).  Patel completed an online new account approval form, which he submitted on behalf of himself and on behalf of Kalpana Patel.  This caused the opening of the TDA Futures Account by Rajiv and Kalpana Patel as joint tenants, even though the account opening was not authorized by Ms. Patel.  Indeed, Ms. Patel never saw the account opening form, never signed it, and never authorized the opening of the Futures Account in any way.

103.     Despite the fact that the TDA Futures Account opened in the name of Ms. Patel was for high-risk trading and Ms. Patel did not have any trading experience or licenses, TDA did not investigate her name appearing on that account.  Indeed, TDA did not take any steps to verify her authorization of the account opening.  TDA did not take any steps to investigate whether Ms. Patel was qualified to own and use the Futures Account.

104.     Ms. Patel is not a sophisticated investor.  In fact, she does not have any securities or commodity futures trading experience.  She was completely unaware of the existence of the TDA Futures Account in her name until her deposition in the CFTC Action.

105.     Due to being a joint account holder in the TDA Brokerage and Futures Accounts, Ms. Patel has been deposed and named a Relief Defendant in the CFTC Enforcement Action, she has had to turn over her joint personal property to the Receiver, and she has had to face liability to and claims of the Receiver and Bluprint's investors, for which she will pay a significant disgorgement amount.

106.     TDA breached its fiduciary duties and duty of care to Ms. Patel by allowing the unauthorized opening of the Futures Account in her name.

107.     TDA accepted a large number of investor deposits into the TDA Brokerage Account that were then immediately swept into the Futures Accounts.  TDA did so without questioning the sudden influx of capital beyond the Patels' reported net worth and the sudden change in trading volume, frequency, dollar amount, and risk level in the Patels' accounts.

108.     TDA permitted large investor deposits into the TDA Brokerage Account from third parties despite its policy that the only acceptable use of the Patels' TDA Accounts was to trade the Patels' proprietary funds.

109.     TDA failed to enforce its policy and allowed Patel to improperly use the TDA Accounts to collect and trade pooled, third-party funds.

110.     TDA paid itself significant commissions and fees totaling approximately $414,086.96 (collectively, the "Transfers") from the voluminous trading occurring in the Patels' Brokerage and Futures Accounts.  Those Transfers came from Bluprint investors' deposits into the TDA Brokerage Account.

111.     TDA breached its fiduciary duties and its duty of care to Ms. Patel, an innocent account holder, by allowing Patel to carry out a fraudulent investment scheme through the use of her TDA Brokerage and Futures Accounts.

112.     On March 19, 2021, nearly two years after Patel started using the TDA accounts to receive, transfer, and trade investor deposits, TDA sent each of the Patels a letter terminating its relationships with them and closing all of their accounts, without further explanation.

### TDA's Actual Knowledge and Facilitation of Patel's Fraudulent Scheme

### TDA's Actual Knowledge of Patel's Fraudulent Scheme

113.     TDA and the Patels had a long relationship lasting nearly 20 years during which the Patels used their TDA Brokerage Account for personal investing.

114.     During the last 2 years of that brokerage-client relationship, the Patels' Brokerage Account received at least $6,335,000 in 23 separate wire transfers from third parties plus a wire for $298,000 from a lender.

115.     TDA had actual knowledge of the receipt of these wire transfers from third parties into the Brokerage Account as it processed, reviewed, and accepted the transfers to allow them to clear.

116.    TDA also had actual knowledge that those transfers were swept into the brokerage and futures trading platforms for trading in short-term securities and futures positions.

117.    TDA had actual knowledge that those funds were also transferred to other trading institutions by wire transfer.

118.    TDA had actual knowledge that those funds were also used for personal expenses such as to place a deposit on a luxury automobile and to fund a brokerage account held by Patel and his son.

119.    TDA had actual knowledge that the high-risk trading resulted in significant losses.

120.    TDA had actual knowledge that the Brokerage Account received a constant influx of deposits from third parties (many of whom were repeat investors) to keep the margin trading debts paid and to allow for ongoing high-risk trading.

121.    TDA had actual knowledge that the account management style for the Patels' Brokerage Account dramatically changed from a personal investment account to a high-volume, risky, futures trading account using funds received from third parties (but not until TDA unjustly enriched itself with two years of fees and commissions).

122.    Finally, recognizing the Patels' Brokerage and Futures Accounts at TDA were running afoul of applicable law and/or TDA bank policies, TDA suddenly and without explanation closed all Patel family accounts.  TDA's actions were too little too late.

123.    This actual knowledge is imputed to Schwab as the subsequent purchaser of TDA.

124.    Even the most cursory review of the Patels' accounts would have revealed Patel's commodity pooling and Ponzi scheme and misuse of investor money in breach of his fiduciary duties.

125.    All conditions precedent to filing this Complaint have been met.

126.     This action is brought within the pertinent statutory limitations period.

127.     Because Patel operated Bluprint from its headquarters in Wellington, Florida, the transactions involving Patel and TDA were carried out in Florida, the Transfers originated from the Brokerage and Futures Account located in Florida, and the misconduct described herein took place in Florida, Florida law applies to the fraudulent transfer claims brought herein.

## CLAIMS FOR RELIEF

## COUNT I

### (Breach of Fiduciary Duty)

128.     Plaintiff re-alleges and incorporates herein the allegations set forth in paragraphs 1 through 127.

129.     TDA owed a fiduciary duty to Ms. Patel as its client.

130.     TDA breached its fiduciary duty to Ms. Patel, by allowing Patel to run a commodity pool investment scheme using their joint Brokerage and Futures Accounts.

131.     TDA knowingly processed wire transfers from investors, which were earmarked for investment in Bluprint that were received into the Brokerage Account that the Patels maintained at TDA.

132.     TDA also breached its fiduciary duty to Ms. Patel by allowing Patel to open and trade in the Futures Account, accepting the new account application without any verification of identity, net worth, annual income, or trading experience for both account holders.  And despite not gathering any information concerning Ms. Patel and not even requesting her signature or identification prior to opening the Futures Account, TDA titled that Account jointly in the names of Patel and Ms. Patel.  TDA, without any due diligence, opened the joint Futures Account as if it was intended for the Patels' personal investments and as if the Patels were qualified to trade their

funds in that Account. TDA then assisted Patel, as alleged herein, to carry out a commodity pooling scheme using that Futures Account without Ms. Patel's knowledge or authorization.

133. Patel breached his fiduciary duty to Ms. Patel through the use of investors' funds for an unlawful purpose and by operating a commodity pool and Ponzi scheme through the Patels' TDA Accounts, all of which was known to TDA.

134. TDA had actual knowledge of Patel's ongoing misconduct in the Patels' TDA Accounts and therefore of the foreseeable and ongoing losses and damages suffered by Ms. Patel due to the misuse and misappropriation occurring in her TDA Accounts.

135. TDA's actual knowledge came from: (i) TDA processing and accepting the third-party deposits of funds into the Patels' Brokerage Account maintained at TDA via wire transfer; (ii) TDA processing and accepting Patel's immediate transfer of those third-party funds to TDA trading platforms and misuse of those funds in the high-risk Futures Account and on the TDA margin trading platforms; (iii) TDA witnessing how Patel's account management and investing style, commencing in June 2019, greatly differed from the Patels' investment style for the previous 17 years; (iv) TDA witnessing that Patel's account management and investment style commencing in June 2019 was not sustainable; (v) TDA processing and transferring at Patel's direction funds to third parties using new third-party deposits and commingling third-party deposits with the Patels' personal funds and loan proceeds; (vi) preparation of account statements and demands for payment of margin debt evidencing that Patel's high-risk trading generated little or no revenue; (vii) TDA discharging of AML-related duties pertaining to "know your customer" and customer due diligence, both at the onboarding stage and throughout the brokerage relationship with the Patels; (viii) access to personal and financial information for the Patels which would have revealed that Patel was misusing the Patels' TDA Accounts, without Ms. Patel's knowledge, consent, or

participation; and (ix) opening a futures account for Ms. Patel without her acknowledgement, consent, or authority.

136.    TDA also failed to follow federal regulations, including without limitation: (1) Customer Identification Program ("CIP"): Under federal law in the United States, Defendant is required to have a CIP in place to verify the identity of its customers.  The CIP requires Defendant to obtain identifying information from each customer, such as name, date of birth, address, and identification number, and to verify that information through a reliable source such as a government-issued ID; (2) Know Your Customer ("KYC"): In addition to the CIP, Defendant has a KYC obligation, which requires it to have a thorough understanding of its customers' identities, business activities, and risk profiles.  This obligation includes ongoing monitoring of customer accounts and transactions to ensure that they are consistent with the customer's expected activities; (3) Enhanced Due Diligence ("EDD"): Defendants are also required to conduct EDD on certain high-risk customers, to ensure that they are not involved in money laundering or other illegal activities; (4) Anti-Money Laundering ("AML") Programs: Defendants are required to have AML programs in place to detect and prevent money laundering and terrorist financing.  This includes monitoring transactions for suspicious activity, filing reports with regulatory authorities when necessary, and maintaining records of customer information.

137.    In the alternative, TDA acted in bad faith or with willful ignorance because it was clear that Patel was repeatedly breaching his fiduciary duty to Ms. Patel, yet TDA deliberately refrained from closing the Patels' accounts and/or refusing to carry out the transactions that were obvious breaches of Patel's fiduciary duties.  In doing so, TDA acted in a commercially unjustifiable manner because, among other things, it either knew or disregarded and refused to

learn facts readily available to it that indicated that Patel was breaching his fiduciary duty to Ms. Patel.

138.    Indeed, TDA earned such significant profits from their relationship with the Patels that it knew or chose to ignore Patel's misconduct and failed to prevent it in any way.  That choice to look the other way amounts to bad faith.

139.    As the actual and foreseeable result of TDA's breach of its duties, Ms. Patel has suffered and will continue to suffer damages, including her loss of funds and liability to pay significant funds to the Receivership Estate and Bluprint's investors and other creditors, for which Ms. Patel has insufficient funds.

WHEREFORE, Plaintiff, Melanie E. Damian, as the Receiver for Bluprint and assignee of Ms. Patel's claims, respectfully requests that the Court enter judgment against Defendant for compensatory damages and/or restitution, interest, and costs incurred by Ms. Patel due to Defendant's breach of fiduciary duties to her as an accountholder.

## COUNT II

### (Aiding and Abetting Breach of Fiduciary Duty)

140.    Plaintiff re-alleges and incorporates herein the allegations set forth in paragraphs 1 through 127.

141.    During the Relevant Period, Patel was Bluprint's Chief Executive Officer and, as such, Patel owed Bluprint a fiduciary duty.

142.    During the Relevant Period, Patel had sole or nearly sole control over Bluprint and was the signatory on the TDA accounts which are the subject of this lawsuit.

143.    During the Relevant Period, Patel knowingly and intentionally engaged in an investment scheme using Bluprint against its own interests to defraud its investors, thereby

breaching his fiduciary duties to Bluprint.

144.    During the Relevant Period, Patel misappropriated Bluprint's funds held at TDA for personal use and for improper trading practices under applicable commodity futures trading laws.

145.    During the Relevant Period, Patel was married to Ms. Patel and they were joint account holders in the TDA Brokerage and Futures Accounts such that Patel owed Ms. Patel a fiduciary duty.

146.    TDA knew that the Patels' Brokerage Account received third party funds and as a result was in possession of non-proprietary funds that Patel was collecting and trading in a commodity pool in violation of applicable commodity trading laws.

147.    TDA substantially assisted Patel's breaches of fiduciary duty to Bluprint by carrying out his instructions to misappropriate Bluprint's funds held in the TDA Brokerage Account, by allowing him to use Bluprint's funds to carry out a commodity pooling and Ponzi scheme, and by providing critical access to brokerage and futures trading platforms to allow Patel to perpetuate the commodity pooling and Ponzi scheme.

148.    TDA also substantially assisted Patel's breach of fiduciary duty to Ms. Patel, not only by allowing him to run an investment scheme using their joint TDA Brokerage and Futures Accounts, but also, by allowing him to open and trade in the Futures Account accepting the new account application without any verification of identity, net worth, annual income, or trading experience for both account holders.  And despite not gathering any information concerning Ms. Patel and not even requesting her signature or identification prior to opening the Futures Account, TDA titled that Account jointly in the names of Patel and Ms. Patel.  TDA simply assumed, without any due diligence, that the joint Futures Account was intended for the Patels' personal investments. TDA then assisted Patel, as alleged herein, to carry out a commodity pooling scheme using that

30

Futures Account without Ms. Patel's knowledge or authorization.

149.    TDA's actual knowledge came from: (i) its manual processing of all investor wires into Patel's Brokerage Account, all of which were clearly from third parties and for significant amounts and likely marked for Bluprint investment, including in some instances money coming from medical practices or trust accounts intended for retirement investing; (ii) its regulatory "know your customer" and customer due diligence obligations which remained in place throughout the relationship with the Patels; (iii) the processing of a high volume of transactions between and among investors and the Patels' Brokerage and Futures accounts reflecting a large amount of incoming new investor payments and outgoing funds for trading and personal expenses; (iv) its long term relationship with the Patels and their account management and investing style during the 17-year period during which the Brokerage Account was only used for personal investing; (v) through the opening of the Futures Account without Ms. Patel's authorization to allow Patel to increase his high-risk trading volume, further facilitating Patel's commodity pooling, Ponzi scheme, ongoing fraud, and breaches of fiduciary duty against Bluprint and Ms. Patel, which account opening procedures should have provided TDA with in depth information on the Patels' level of sophistication as investors, net worth, and source of funds used for trading; (vi) TDA' s discharging of AML-related duties pertaining to "know your customer" and customer due diligence, both at the onboarding stage and throughout the brokerage relationship with the Patels; and (vii) TDA benefitting from the scheme by knowingly taking commissions and fees on the high-volume trading in both the Brokerage and Futures Accounts, which commissions and fees were paid with investors' funds.

150.    Despite such knowledge, Defendant knowingly participated in and provided substantial assistance to Patel's breaches of fiduciary duties by, among other things: (i) carrying out Patel's instructions to misappropriate Bluprint's funds, by allowing him to use Bluprint's funds

to carry out a commodity pooling and Ponzi scheme; (ii) providing critical access to brokerage and futures trading platforms to allow Patel to perpetuate the commodity pooling and Ponzi scheme; (iii) allowing Patel to misappropriate Bluprint's funds by using them for payment of clearly personal expenses and transfers to Patel's son; and (iv) failing to or refusing to fulfill its "know your customer," due diligence and other regulations and standard practices, including failing to implement and adhere to compliance and monitoring protocols concerning Patel's receipt and use of third-party funds and Patel's opening and use of the joint Futures Account without Ms. Patel's knowledge or authorization.

151.    As a direct and proximate result of Defendant's aiding and abetting Patel's breach of fiduciary duty, Bluprint has been damaged and continues to suffer damages.

152.    As a direct and proximate result of Defendant's aiding and abetting Patel's breach of fiduciary duty, Ms. Patel has been damaged and continues to suffer damages.

WHEREFORE, Plaintiff, Melanie E. Damian, as the Receiver for Bluprint and assignee of Ms. Patel's claims, respectfully requests that the Court enter judgment against Defendant: (1) for compensatory damages and/or restitution, interest, and costs incurred by Bluprint and its investors and creditors due to Defendant's aiding and abetting Patel's breach of his fiduciary duties to Bluprint and its investors; and (2) for compensatory damages and/or restitution, interest, and costs incurred by Ms. Patel due to Defendant's aiding and abetting Mr. Patel's breach of his fiduciary duties to Ms. Patel.

## COUNT III

### (Negligence)
### (in the alternative)

153.    Plaintiff re-alleges and incorporates herein the allegations set forth in paragraphs 1 through 127.

154.    This is an action against Defendant stemming from its negligence in allowing Patel to collect, pool, and misappropriate Bluprint's investor funds in the TDA Brokerage and Futures Accounts in breach of his fiduciary duties to innocent, unknowing, co-account holder Ms. Patel.

155.    This is also an action against Defendant stemming from its negligence in the unauthorized opening of the Futures Account without receiving consent from Kalpana Patel and without taking any measures to verify her knowledge of and/or authorization to be a named account holder.

156.    Defendant is a financial institution that had a duty to exercise reasonable care in knowing its client and the source and use of their funds. Specifically, Defendant had a duty to of care to innocent, account holder Ms. Patel requiring that Defendant not facilitate the misuse of Ms. Patel's Brokerage Account.

157.    Defendant also had a duty to take security measures that would detect and prevent fraudulent investment schemes, such as illegal pooling of third-party funds.  It was foreseeable that allowing receipt of many significant transfers, from many different third parties, over a two-year period, into the Brokerage Account opened only for personal trading would lead to fraudulent trading activity and violations of applicable securities and commodities laws.

158.    Defendant failed to establish and maintain programs to detect and prevent such fraudulent investment schemes.  Defendant knew that the Patels' Brokerage and Futures Accounts were engaged in very risky margin trading, losing large amounts of money, and that the account management was not sustainable.

159.    Yet, Defendant waited two years, until the Brokerage and Futures Accounts were nearly depleted, to shut them down and terminate the business relationship with the Patels.

160.    In addition, Defendant is a financial institution that had a duty to exercise reasonable care in fully performing and complying with identity verification policies.

161.    Among its duties and under applicable law, Defendant was required to obtain sufficient identifying information to enable the Defendant to form a reasonable belief regarding the identity of its customers before opening accounts for them.[3] Moreover, Defendant had a duty to obtain authorization from Ms. Patel before opening the Futures Account in her name.

162.    Defendant breached that duty, specifically, by the opening of the Futures Account in Ms. Patel's name without her knowledge, consent, or authorization.  The failure to obtain sufficient identifying information and authority from Ms. Patel before opening the Futures Account caused the identity theft of Ms. Patel and allowed for reckless trading of investor funds in her name and exposed her to potential liability to Bluprint investors and the Receiver.

WHEREFORE, Plaintiff, Melanie E. Damian, as the Receiver for Bluprint and assignee of Ms. Patel's claims, respectfully requests that the Court enter judgment against Defendant for

---

[3] Customer Identification Program ("CIP"): Under federal law in the United States, consumer trading institutions are required to have a CIP in place to verify the identity of their customers. The CIP requires consumer trading institutions to obtain identifying information from each customer, such as name, date of birth, address, and identification number, and to verify that information through a reliable source such as a government-issued ID.

Know Your Customer ("KYC"): In addition to the CIP, consumer trading institutions have a KYC obligation, which requires them to have a thorough understanding of their customers' identities, business activities, and risk profiles. This obligation includes ongoing monitoring of customer accounts and transactions to ensure that they are consistent with the customer's expected activities.

Enhanced Due Diligence ("EDD"): Consumer trading institutions are also required to conduct EDD on certain high-risk customers, such as foreign political figures, to ensure that they are not involved in money laundering or other illegal activities.

Anti-Money Laundering ("AML") Programs: Consumer trading institutions are required to have AML programs in place to detect and prevent money laundering and terrorist financing.  This includes monitoring transactions for suspicious activity, filing reports with regulatory authorities when necessary, and maintaining records of customer information.

compensatory damages and/or restitution, interest, and costs incurred by Ms. Patel due to Defendant's negligence in connection with the opening and use of the TDA Brokerage and Futures Accounts.

## COUNT IV

### (Fraudulent Transfer under § 726.105(1)(a), Fla. Stat., Florida Uniform Fraudulent Transfer Act)

163.     Plaintiff re-alleges and incorporates herein the allegations set forth in paragraphs 1 through 127.

164.     This is a claim to avoid and recover fraudulent transfers pursuant to Florida Statutes Section 726.105(1)(a).

165.     The Receiver acting on behalf, and standing in the shoes, of Bluprint has standing within the meaning of the Florida Uniform Fraudulent Transfer Act to seek the return of fraudulent transfers that Patel made to Defendant TDA pursuant to the actual fraudulent transfer provision of the Act.

166.     Because the Transfers were fraudulent under Florida Statutes Section 726.105(1)(a), the Receiver may avoid the Transfers, pursuant to Florida Statutes Section 726.109(2).

167.     As detailed above, Patel made the Transfers of funds and/or assets totaling $414,086.96 to and for the benefit of Defendant TDA.

168.     The funds transferred by Patel were derived from Bluprint's investors, which were deposited into the Brokerage Account held by Patel and Ms. Patel at TDA.

169.     Defendant TDA received the Transfers totaling at least $414,086.96 from Patel without providing reasonably equivalent value to Bluprint or its investors in exchange for the Transfers.

170.     At the time that the Receivership Defendants made the Transfers to TDA, Patel was operating Bluprint as a fraudulent scheme and Ponzi scheme to the detriment of Bluprint and its investors and creditors.

171.     Patel made the Transfers in furtherance of that fraudulent scheme and Ponzi scheme.

172.     At the time that Patel directed the trading activity leading to the Transfers, Patel removed and/or concealed assets of Bluprint from the reach of its investors and creditors. Patel was also operating a commodity pooling scheme and engaged in high-risk trading against the interests of Bluprint and its investors and creditors.

173.     TDA paid itself the Transfers at Patel's direction, as a result of Patel's adverse interest in and control of Bluprint and his continued breaches of his fiduciary duties to Bluprint.

174.     Thus, Patel had the actual intent to delay, hinder, or defraud creditors of Bluprint, and made the Transfers to delay, hinder, or defraud those creditors. Consequently, the Transfers were inherently fraudulent pursuant to Florida Statutes Section 726.105(1)(a).

175.     As a direct and proximate result of Patel's fraudulent Transfers to TDA, the Receivership Estate has been diminished in the amount of at least $414,086.96, and the remaining assets of the Receivership Estate are insufficient to pay the Receivership Estate's debts and liabilities, including, most notably, the claims of the investors and creditors who were defrauded by the Receivership Defendants.

WHEREFORE, Plaintiff, Melanie E. Damian, as the Receiver for Bluprint and assignee of Ms. Patel's claims, respectfully requests that the Court enter judgment against Defendant: (1) determining that the Transfers of investor funds from Patel to Defendant were fraudulent and avoiding those Transfers; (2) entering a money judgment against Defendant in the full amount of

the Transfers it received, and, if necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to such Transfers; and (3) awarding Plaintiff damages, costs, prejudgment interest, and post-judgment interest.

## COUNT V

**(Fraudulent Transfer under § 726.105(1)(b), Fla. Stat.,
Florida Uniform Fraudulent Transfer Act)**

176.    Plaintiff re-alleges and incorporates herein the allegations set forth in paragraphs 1 through 127.

177.    This is a claim to avoid and recover fraudulent transfers pursuant to Florida Statutes Section 726.105(1)(b).

178.    The Receiver acting on behalf, and standing in the shoes, of Bluprint has standing within the meaning of the Florida Uniform Fraudulent Transfer Act to seek the return of fraudulent transfers that Patel made to Defendant TDA pursuant to the constructive fraudulent transfer provision of the Act.

179.    The Transfers were made to Defendant without Bluprint receiving reasonably equivalent value in exchange for the Transfers or obligations incurred by Bluprint.  In fact, TDA did not provide *any* value to Bluprint or its investors in exchange for the Transfers or otherwise, and Bluprint never earned actual profits for itself or its investors.

180.    Any services that TDA may have provided to Bluprint only facilitated and perpetuated the fraud against then-current investors and the new investors being recruited.  Thus, TDA did not provide any reasonably equivalent value or any other benefit to Bluprint or its investors and creditors in exchange for the Transfers it received from the Receivership Defendants; rather the Transfers increased the damages suffered by Bluprint by increasing the amounts it owed

to its investors and creditors which will be reflected in any restitution that Bluprint will be required to pay in the CFTC Enforcement Action.

181.    Also, the Transfers occurred when Bluprint's remaining assets were unreasonably small in relation to Bluprint's business transactions and when the Receivership Defendants intended to incur or believed, or reasonably should have believed, that the Receivership Defendants would incur debts beyond their abilities to pay as they became due.

182.    As a direct and proximate result of the Receivership Defendants' fraudulent Transfers to TDA, the Receivership Estate has been damaged or otherwise diminished in the amount of at least $414,086.96, and the remaining assets of the Receivership Estate are insufficient to pay the Receivership Estate's debts and liabilities, including, most notably, the claims of the investors and/or creditors who were defrauded by the Receivership Defendants.

WHEREFORE, Plaintiff, Melanie E. Damian, as the Receiver for Bluprint and assignee of Ms. Patel's claims, respectfully requests that the Court enter judgment against Defendant: (1) determining that the Transfers of investor funds from Patel to Defendant were fraudulent and avoiding those Transfers; (2) entering a money judgment against Defendant in the full amount of the Transfers it received, and, if necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to such Transfers; and (3) awarding Plaintiff damages, costs, prejudgment interest, and post-judgment interest.


## COUNT VI

### (Unjust Enrichment as to the Transfers)

183.    Plaintiff re-alleges and incorporate herein the allegations set forth in paragraphs 1 through 127.

184.    The Receivership Defendants conferred a benefit on Defendant when Patel made the Transfers to and/or for the benefit of Defendant in the amount of at least $414,086.96, all of which were derived from the investors of the Receivership Defendants.

185.    TDA had knowledge of the benefit it received from the Receivership Defendants as a result of the Transfers and voluntarily accepted and retained the benefit conferred.

186.    It is inherently unfair and inequitable that the funds of investors defrauded in the Receivership Defendants' fraudulent scheme are retained by and used to benefit TDA, rather than being returned to the Receivership Estate for the benefit of the defrauded investors and creditors.

187.    As a direct and proximate result of Defendant's retention of at least the $414,086.96 that the Receivership Defendants had fraudulently transferred to or for the benefit of TDA, the Receivership Estate has been diminished, and, under the circumstances, equity dictates that TDA should return the funds it received from the Receivership Defendants to the Receiver for the benefit of all of the defrauded investors and creditors.

WHEREFORE, Plaintiff, Melanie E. Damian, as the Receiver for Bluprint and assignee of Ms. Patel's claims, respectfully requests that the Court enter judgment against Defendant: (1) determining that Defendants was unjustly enriched by the Transfers of investor funds from Patel to Defendant; (2) entering a money judgment against Defendant in the full amount of the Transfers it received, and, if necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to such Transfers; and (3) awarding Plaintiff damages, costs, prejudgment interest, and post-judgment interest.

## COUNT VII

**(Aiding and Abetting Violation of Commodity Exchange Act)**

188.    Plaintiff re-alleges and incorporates herein the allegations set forth in paragraphs 1 through 127.

189.    TDA knowingly aided, abetted, counseled, induced, and/or procured the violations of the Commodity Exchange Act ("CEA") alleged herein.  TDA did so knowing of Patel's violations of the law, and willfully intended to assist those violations in violation of 22(a)(1) of the CEA, 7 U.S.C § (a)(1).

190.    Section 22(a) of the CEA provides:

> (1)    Any person. . .who willfully aids, abets. . .a violation of this Act [7 USCS §§ 1, *et seq.*] shall be liable for actual damages resulting from one or more of the transactions referred to in subparagraphs (A) through (D) of this paragraph and caused by such violation to any other person –
> *
> *
> (B) who made through such person any contract of sale of any commodity for future delivery (or option on such contract or any commodity); or who deposited with or paid to such person money, securities, or property (or incurred debt in lieu thereof) in connection with any order to make such contract;
> (C) who purchased from or sold to such person or placed through such person an order for the purchase or sale of
> (i) an option subject to section 4c of this Act. . .;
> (ii) a contract subject to section 19 of this Act; or
> (iii) an interest or participation in a commodity pool; or
> (iv) a swap.

7 U.S.C. § 25(a)(1)(B)-(C).

191.    Patel, through TDA, made multiple option contracts at issue here (the "Option Contracts") on behalf of investors, as provided in Section 25(a)(1)(B) of the CEA.  The Option Contracts are options on contracts for the future delivery of commodities, specifically, an index of securities, as described in the CEA, 7 U.S.C. §§ 25(a)(1)(B) and 6b(e)(3).

192.    As described *supra,* Patel was defrauding his investors in violation of 7 U.S.C § 60

(1), which states:

> (1) It shall be unlawful for a commodity trading advisor, associated person of a commodity trading advisor, **commodity pool operator**, or associated person of a commodity pool operator, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—
>
>> (A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or
>>
>> (B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

7 U.S.C § 6o (1) (emphasis added).

193.   TDA knew that Patel was engaged in very risky margin trading and losing large amounts of money, and that the account management was not sustainable.

194.   TDA knew that the Patels' Brokerage Account received third-party funds and as a result was in possession of non-proprietary funds that Patel was collecting in the Brokerage Account and trading through both the Brokerage and Futures Accounts in a commodity pool in violation of the CEA sections requiring registration.

195.   By virtue of the conduct alleged above, TDA willfully and recklessly aided and abetted Patel's violations of the CEA, and thereby violated 7 U.S.C. § 25(a)(1)(A).

196.   As a direct and proximate result of TDA's breach of the CEA, Ms. Patel, Bluprint, and its investors have suffered actual damages from the transactions involving the purchase and sale of commodity futures.

197.   TDA willfully aided and abetted the fraud by not conducting background investigations of the Patels and Bluprint as required by the CEA.

198.   The failure to investigate the high-volume third-party transfers into the Brokerage Account demonstrated extreme recklessness that departed from the standard of care for a futures commission merchant.

199.    The volume of transfers from third parties and the high-volume trading with turn-around losses was unusual in character and degree for a personal trading account.

200.    A cursory review of the Brokerage Account would have revealed that Patel was improperly investing for a commodity pool and would have prompted a closing of all of the Patels' accounts.

201.    Upon information and belief and based on the abrupt closing of the Patels' accounts, TDA knew that Patel was running an improper commodity pool or Ponzi scheme and was trading on behalf of other investors.

202.    As a direct and proximate result of TDA's aiding and abetting Patel's violation of the CEA, Bluprint and its investors have been damaged and are entitled to actual damages.

WHEREFORE, Plaintiff, Melanie E. Damian, as the Receiver for Bluprint and assignee of Ms. Patel's claims, respectfully requests that the Court enter judgment against Defendant for compensatory damages and/or restitution, interest, and costs incurred by Bluprint and its investors due to Defendant's aiding and abetting Patel's violations of the CEA.

## COUNT VIII

**(Violation of Commodity Exchange Act)**

203.    Plaintiff re-alleges and incorporates herein the allegations set forth in paragraphs 1 through 127.

204.    The CEA provides that no futures account may be opened without furnishing written disclosures:

1) Except as provided in 1.65, **no futures commission merchant**, . . .  **may open a commodity futures account for a customer**, other than for a customer specified in paragraph (f) of this section, unless the futures commission merchant or introducing broker first:

(i) Furnishes the customer with a separate written disclosure statement containing only the language set forth in paragraph (b) of this section (except for nonsubstantive additions such as captions) or as otherwise approved under paragraph (c) of this section; Provided, however, that the disclosure statement may be attached to other documents as the cover page or the first page of such documents and as the only material on such page; and

(ii) Receives from the customer an acknowledgment signed and dated by the customer that he received and understood the disclosure statement.

*See* 17 CFR § 1.55(a).

205.    TDA did not obtain Ms. Patel's consent prior to opening the Futures Account in her name nor did it verify the identity of the individual on behalf of whom it was opening an account. For that same reason, TDA did not provide Ms. Patel with any disclosures, much less the detailed disclosures required under the CEA.

206.    Indeed, TDA acted recklessly and knowingly in its violation of the CEA disclosure requirements as Ms. Patel never saw the account opening form, never signed it, and never authorized the opening of the Futures Account in any way.

207.    As a direct and proximate result of Defendant's violation of the CEA, Ms. Patel sustained actual damages.

208.    Because she was a joint account holder with Patel of the Futures Accounts, Ms. Patel has been deposed and named a Relief Defendant in the CFTC Enforcement Action against Patel and Bluprint, she has had to turn over to the Receiver the personal property she jointly owned with Patel, she has had to face potential liability and claims from the Receiver and from Bluprint's investors, and she will be required to pay significant funds to the Receivership Estate.

209.    Ms. Patel is entitled to recover her actual damages for Defendant's violations of the CEA alleged herein.  Thus, the Receiver, as assignee of Ms. Patel's claims asserted herein, is entitled to recover Ms. Patel's actual damages from Defendant.

WHEREFORE, Plaintiff, Melanie E. Damian, as the Receiver for Bluprint and assignee of Ms. Patel's claims, respectfully requests that the Court enter judgment against Defendant for compensatory damages and/or restitution, interest, and costs suffered by Ms. Patel as a TDA account holder due to Defendant's violations of the CEA.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury of all claims so triable.

Dated: March 30, 2023.

Respectfully submitted,

**DAMIAN | VALORI | CULMO**
*Counsel for Plaintiff*
1000 Brickell Avenue, Suite 1020
Miami, Florida 33131
Telephone: (305) 371-3960
Facsimile: (305) 371-3965

*/s/Kenneth Dante Murena*
Kenneth Dante Murena, P.A.
Florida Bar No. 147486
kmurena@dvllp.com